FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Mediware Information Systems, Inc., a )
New York corporation, )
 )
 )
Plaintiff, )   Case No.:
 )
 )   3:13-cv-103-J-99MMH-JRK
v. )
 )
HemaTerra Technologies, LLC, a Florida limited )
liability company, Todd Collins, Simon Dawson, )
Paul Revay, Scott Ceccorulli, and TJC Florida )
Investments, Inc. )
 )
Defendants. )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Mediware Information Systems, Inc. ("Mediware" or "Plaintiff"), by its attorneys, sues

defendants, HemaTerra Technologies, LLC ("HemaTerra"), TJC Florida Investments, Inc.,

("TJC") Todd Collins ("Collins"), Scott Ceccorulli ("Ceccorulli"), Simon Dawson ("Dawson"),

and Paul Revay ("Revay" and together with the named defendants, "Defendants"), and alleges as

follows:

### NATURE OF THE ACTION

1.     Mediware is a leading provider of specialized technology solutions in health care.

Mediware's product portfolio includes a blood supply chain management software suite,

developed and managed by Mediware's Blood Management Division. Mediware's Blood

Management Division provides technology systems to customers whose business involves blood

donor recruiting, blood product manufacturing, and transfusion. Today, more than 60 percent of

the nation's blood supply flows through Mediware's systems.

2.      In 2007, Mediware entered into an Asset Purchase Agreement ("APA") with Defendant Collins and Defendant Ceccorulli for the acquisition of the blood management company, Integrated Marketing Solutions, LLC ("IMS"), then owned and operated by Defendants Collins and Ceccorulli.

3.      The centerpieces for the inducement of Mediware to engage in the transaction was: (1) the exclusive acquisition of the confidential intellectual property associated with the blood management software IMS owned; and (2) the hiring of key IMS employees to further advance the acquired technology.

4.      To protect the confidentiality of the software, the APA contains extensive representations and warranties requiring the signatories to keep the intellectual property secret and confidential.

5.      In conjunction with the APA, Defendants Collins, Ceccorulli, Dawson, and Revay entered into employment agreements with Mediware.   Like the APA, the employment agreements protect the intellectual property Mediware acquired from IMS by prohibiting Defendants from impermissibly using the blood management technology to compete with Mediware in the event Defendants chose to seek alternative employment.

6.      Contrary to their obligations under the APA, their employment agreements, applicable statutes prohibiting the misappropriation of trade secrets, and Florida common law, Defendants Collins, Ceccorulli, Dawson, and Revay plotted the creation of a competing firm while still employed at Mediware.

7.      Defendants ultimately formed and now operate HemaTerra, a business that provides customers software for blood management services.   HemaTerra's software products

2

were created by Defendants' misuse of the very intellectual property IMS sold Mediware and that Defendants covenanted to treat as confidential trade secrets of Mediware and never disclose.

8.    Mediware seeks to enjoin Defendants from further misuse of Mediware's trade secrets and to recover damages associated with Defendants' misappropriation of Mediware's property.

## PARTIES

9.    Plaintiff Mediware is a New York corporation with its principal place of business located at 11711 West 79th Street in Lenexa, Kansas.

10.    Defendant HemaTerra is a Florida limited liability company with its principal place of business located at 135 2nd Ave North, Suite 5 in Jacksonville, Florida.

11.    Defendant Todd Collins is an individual who resides in and is a citizen of the State of Florida.

12.    Defendant Scott Ceccorulli is an individual who resides in and is a citizen of the State of Florida.

13.    Defendant Simon Dawson is an individual who resides in and is a citizen of the State of Maryland.

14.    Defendant Paul Revay is an individual who resides in and is a citizen of the State of Maryland.

15.    Defendant TJC Florida Investments, Inc. is a Florida corporation with its principal place of business located at 1510 Harrington Park Dr., Jacksonville, Florida.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of different states than Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.    Venue is proper pursuant to 28 U.S.C. § 1391(1) and 28 U.S.C. § 1391(2) because Defendants reside in this district and a substantial part of the events giving rise to this action occurred in the district.

## BACKGROUND FACTS

### The Asset Purchase Agreement

18.    Prior to October 2007, Mediware focused its business on providing software to manage hospital patients' and outpatients' blood and medication information.

19.    Mediware expanded its blood management business on October 16, 2007, when Mediware agreed to purchase and IMS agreed to sell substantially all of IMS' assets, as set forth in the APA between Mediware and IMS.  A true and correct copy of the APA is attached hereto as **Exhibit 1**.

20.    At the time the APA was executed, IMS provided software for blood and plasma donation centers in North America and Europe.  The intellectual property, including the software Mediware acquired from IMS through the APA, offers customers blood donor management tools, blood donor recruitment services, and a new version of IMS's LifeTrak software product, which enables blood centers to more efficiently manage thousands of donor records, including the complex donor eligibility requirements that blood centers are required to calculate.

21.    In addition to assisting with blood donor recruitment and donor center management, the acquired intellectual property, including the software, helps with blood-drive

coordination, computer-assisted donor screening, testing, clinical processing, product distribution, and hospital relationship management (together with the products described in paragraph 19 and detailed in schedules 5.16(e), 5.16(k), 5.16(l) and 5.17(a) of the APA, the "Software").

## The Employment Agreements

22.     In connection with the APA, Mediware hired certain key IMS employees, including IMS' president and chief executive officer, Todd Collins; IMS' chief information officer Scott Ceccorulli; IMS' director of software engineering, Simon Dawson; and IMS' senior vice president of sales and marketing, Paul Revay, all of whom are defendants in this lawsuit.

23.     Each of the former IMS employees executed a Mediware employment agreement. A true and correct copy of each Defendant's employment agreement is attached hereto as **Exhibit 2** (Collins), **Exhibit 3** (Ceccorulli), **Exhibit 4** (Dawson) and **Exhibit 5** (Revay).

24.     As executives of Mediware, the relevant terms and conditions of Collins' and Ceccorulli's employment agreements are the same.

25.     Pursuant to the terms of their employment agreements, Collins and Ceccorulli acknowledged that in the intensely competitive blood management business, they would have access to Confidential Information and Trade Secrets of Mediware, as those terms are defined in the employment agreements.  They further explicitly agreed that they would not disclose or use such information.  Specifically, Collins and Ceccorulli agreed to the following:

    6    Confidentiality and Restrictive Covenants.

        (a)     The Executive acknowledges that:

            (i)     the business in which the Company is engaged is intensely
    competitive and his employment by the Company will require that he have continual
    access to and knowledge of confidential information of the Company, including,
    but not limited to, the nature and scope of its products, the object and source code

offered, marketed or under development by the Company or under consideration by the Company for development, acquisition, or marketing by the Company and the documentation prepared or to be prepared for use by the Company (and the phrase "by the Company" shall include other vendors, licensees or and resellers and value-added resellers of the Company's products or proposed product) and the Company's plans for creation, acquisition, improvement or disposition of products or software, expansion plans, financial status and plans, products, improvements, formulas, designs or styles, method of distribution, lists of remarketing and value-added and other resellers customer lists and contact lists, product development plans, rules and regulations, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business, provided that Confidential Information will not include information which has become publicly known otherwise than through a breach by Executive of the provisions of this Agreement (collectively, "Confidential Information");

(ii)    the direct or indirect disclosure of any Confidential Information would place the Company at a serious competitive disadvantage and would do serious damage, financial and otherwise, to the Company's business;

(iii)    by his training, experience and expertise, the Executive's services to the Company will be special and unique; and

(iv)    if the Executive leaves the Company's employ to work for a competitive business, in any capacity, it would cause the Company irreparable harm.

(b)    Covenant Against Disclosure. The Executive therefore covenants and agrees that all Confidential Information relating to the business products and services of the Company, any subsidiary, affiliate, seller or reseller, value-added vendor or customer shall be and remain the sole property and confidential business information of the Company, free of any rights of the Executive. The Executive further agrees not to make any use of the confidential information except in the performance of his duties hereunder and not to disclose the information to third parties, without the prior written consent of the Company. The obligations of the Executive under this Paragraph 6 shall survive any termination of this Agreement. The Executive agrees that, upon any termination of his employment with the Company, all Confidential Information in his possession, directly or indirectly, that is in written or other tangible or readable form (together with all duplicates thereof) will forthwith be returned to the Company and will not be retained by the Executive or furnished to any third party, either by sample, facsimile, film, audio or video cassette, electronic data, verbal communication or any other means of communication.

(Ex. 2 ¶ 6; Ex. 3 ¶ 6.)

26.    Consistent with the APA's purpose of selling all of the intellectual property developed by Collins and Ceccorulli while at IMS to Mediware, Collins and Ceccorulli also agreed that their obligations under Paragraph 6 would survive indefinitely any termination of their employment agreements.  (Ex. 2 ¶ 6.)

27.    Collins and Ceccorulli made a similar agreement not to disclose Mediware's Confidential Information and Trade Secrets under the terms of the APA.  (Ex. 1 Arts. IX, X.)

28.    Collins and Ceccorulli further agreed that all Intellectual Property, as defined in Paragraph 7 of their employment agreements, developed during the course of their employment is the exclusive property Mediware.  (Ex. 2 ¶ 7.)

29.    If Collins and Ceccorulli breached the terms of their employment agreements related to Mediware's Confidential Information, Trade Secrets and/or Intellectual Property, Collins and Ceccorulli agreed that Mediware would be entitled to injunctive relief with respect to that breach.  (Ex. 2 ¶ 9; Ex. 3 ¶ 9.)

30.    In addition to agreeing that they are prohibited from using and disclosing Mediware's Confidential Information and Trade Secrets, Collins and Ceccorulli agreed, under their employment agreements and the APA, that they would not compete with Mediware or solicit Mediware employees for a term of one year after the termination of their employment with Mediware.  (Ex. 2 ¶ 6.)

31.    Specifically, Collins and Ceccorulli agreed to the following restrictive covenants:

(b)    Non-competition. The Executive agrees that, during the Term of Employment and for a period of one (1) year following the date of termination of the Executive's employment with the Company, the Executive will not, directly or indirectly, own, manage, operate, control or participate in the ownership, management or control of, or be connected as an officer, employee, partner, director, or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any entity or business which competes with any business conducted by the Company or any of its subsidiaries or affiliates, in the

United States, Canada and the UK and any other area where such business is being conducted by the Company (or its affiliates) on the date the Executive's employment is terminated hereunder. Notwithstanding the foregoing the Executive's ownership of securities of a public company engaged in competition with the Company not in excess of five (5%) percent of any class of such securities shall not be considered a breach of the covenants set forth in this Paragraph 6. For the avoidance of doubt, the terms of this non-competition section shall not in any way limit the covenants set forth in that certain Asset Purchase Agreement (the "APA") by and among the Company, the Executive and certain other third parties dated as of the date hereof. The covenants in the APA are in addition to those set forth herein.

(c)    Further Covenant.  Until the date which is one (1) year after the date of the termination of the Executive's employment hereunder for any reason, the Executive will not, directly or indirectly, take any of the following actions, and, to the extent the Executive owns, manages, operates, controls, is employed by or participates in the ownership, management, operation or control of, or is connected in any manner with, any business of the type and character engaged in and competitive with that conducted by the Company or any of its subsidiaries or affiliates during the period of the Executive's employment, the Executive will use his best efforts to ensure that such business does not take any of the following actions:

(i)    persuade or attempt to persuade any customer of the Company or any seller, reseller or value-added vendor of the Company or of its products to cease doing business with the Company or any of its subsidiaries or affiliates, or to reduce the amount of business it does with the Company or any of its subsidiaries or affiliates;

(ii)    solicit for himself or any entity the business of (A) any customer of the Company or any of its subsidiaries or affiliates, or (B) any seller, reseller or value-added vendor of the Company, or of its products, or (C) solicit any business from a customer which *was* a customer of the Company or any of its subsidiaries or affiliates within six months prior to the termination of the Executive's employment; and

(iii)    persuade or attempt to persuade any employee of the Company or any of its subsidiaries or affiliates or any individual who was an employee of the Company or any of its subsidiaries or affiliates, at any time during the six-month period prior to the Executive's termination of employment, to leave the employ of the Company or any of its subsidiaries or affiliates.

32.     As non-executive employees, Defendants Dawson and Revay executed employment agreements with identical relevant terms.

33.     Both Revay and Dawson agreed not to disclose or make use of any of Mediware's confidential information, trade secrets or other Proprietary Information, as defined in Paragraph 1 of their employment agreements. Specifically, Revay and Dawson agreed:

> 1.     Confidentiality. Except as the Company may otherwise consent in writing, I agree to keep confidential, and not to disclose, or make any use of except for the benefit of the Company, at any time either during or subsequent to my employment by the Company, including any employment prior to the date hereof, any trade secrets, confidential information, knowledge, data or other information of the Company relating to products, processes, know-how, designs, copyrights, software code, formulas, test data, financial information, product plans, customer lists, business plans, marketing plans and strategies, and pricing strategies or other subject matter pertaining to any business of the Company or any of its customers, consultants, licensees or affiliates (collectively, "Proprietary Information"). I further agree not to deliver, reproduce or in any way allow any Proprietary Information, in any media, to be delivered or used by any third parties without the prior specific direction or consent of a duly authorized representative of the Company. I agree to deliver promptly to the Company on termination of my employment with the Company (whether by me or by the Company, whether or not for cause and whatever the reason), or at any time the Company may so request, all memoranda, notes, records, reports, manuals, drawings, blueprints, and any other documents or media containing any Proprietary Information or derived therefrom, including all copies of such materials, which I may then possess or have under my control. I further agree that upon termination of my employment (whether by me or by the Company, whether or not for cause and whatever the reason) that I shall not take with me any memoranda, notes, records, reports, manuals, drawings, blueprints, or any other documents or media containing or derived from the Proprietary Information.

(Ex. 4 ¶ 1; Ex. 5 ¶ 1.)

34.     Revay and Dawson also agreed not to solicit Mediware employees for a term of one year after the termination of their employment with Mediware. (Ex. 4 ¶ 2; Ex. 5 ¶ 2.)

35.     Like Collins and Ceccorulli, Revay and Dawson agreed that if they breached their employment agreements, Mediware would be entitled to an injunction or other appropriate order to restrain such breach. (Ex. 4 ¶ 9; Ex. 5 ¶ 9.)

36.    Revay and Dawson further agreed that if they breached their employment agreements, they would indemnify Mediware for all loss, damage, and expense to enforce Mediware's rights under those agreements.  (Ex. 4 ¶ 9; Ex. 5 ¶ 9.)

37.    Despite Mediware's diligent efforts to protect its Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information, Defendants misused Mediware's property to conspire and launch a competitive business.  Defendants' conduct in this regard violated the APA, Defendants' employment agreements, and applicable statutes prohibiting the misappropriation of trade secrets.

38.    Although certainly hatched earlier, the first known implementation of this plan occurred in 2009 when Defendant Collins registered the domain name HemaTerra.com.  A true copy of the registration is attached as **Exhibit 6**.

39.    In 2009, when Defendant Collins created the competing business website and registered the domain name HemaTerra.com, he was under contract with Mediware and was obligated to "devote his full business time and energies to the business and affairs of" Mediware.  (Ex. 2 ¶ 1.)

40.    Defendant Collins' employment agreement terminated in December 2010.

41.    In connection with the expiration of Collin's employment agreement, on January 1, 2011, Mediware and Collins, through TJC, an entity in which Collins is the President, Secretary, CEO and sole director, entered into the consulting agreement with Mediware. A true and correct copy of the consulting agreement is attached hereto as **Exhibit 7**.

42.    Under the Consulting Agreement, TJC agreed to continue to work on projects for Mediware and provide deliverables related to the intellectual property and Software acquired by Mediware from IMS.

43.    Furthermore, pursuant to the terms of the consulting agreement, TJC agreed not to disclose or make use of any of Mediware's Confidential Information, as defined in Paragraph 5 of the consulting agreement.  Specifically, TJC agreed:

5.    <u>Confidentiality</u>

A.    Consultant agrees that the business information, customer information, strategic plans, contacts, software, technical documents, documents specifications, deliverables and all other information Consultant may have access to during the term of this Agreement including but not limited to, technical, source code, regulatory, marketing and legal information (the "Confidential Information") whether in written, verbal or other form, is confidential and proprietary information of Mediware. Consultant agrees that all Confidential Information which Consultant acquires during consultant's engagement as a Consultant to Mediware, whether during or outside business hours, whether or not on Mediware's premises, as the result of any disclosure to Consultant, or in any other way, shall be regarded as held by Consultant in a fiduciary capacity solely for the benefit of Mediware, its successors or assigns, and shall not at any time, either during the term of the Agreement or thereafter, be disclosed, divulged, furnished, or made accessible by Consultant to anyone or be otherwise used by Consultant, except in the performance of its obligation hereunder. Upon termination of its engagement, Consultant shall return or deliver to Mediware all tangible forms of Confidential Information in consultant's possession or control, and shall retain no copies thereof. Consultant will use its best efforts, including, without limitation, written instructions to its employees, to protect the confidential and proprietary status of all Confidential Information. Consultant shall: (I) maintain it in strict confidence and take all reasonable steps to prevent the disclosure of Confidential Information to third parties; (ii) use at least the same degree of care as it uses in maintaining the secrecy of its own Confidential Information (but no less than a reasonable degree of care); and, (iii) not remove any proprietary, confidential, or copyright notices placed on confidential Information.

44.    TJC agreed that in the event of "any breach or threatened breach" of Paragraph 5 of the consultant agreement, Mediware would be entitled to a permanent injunction and other rights and remedies at law and equity against TJC, its officers, directors, employees and agents. (Ex. 7, ¶ 5(b))

45.     Defendant Collins is the President, Secretary, Treasurer, sole Director and CEO of TJC. Consequently, in the event of "any breach or threatened breach" of Paragraph 5 of the consultant agreement, Mediware would be entitled to a permanent injunction and other rights and remedies at law and equity against any TJC officer, director, employee and agent, including Collins. (Ex. 7, ¶ 5(b))

46.     TJC also agreed that Mediware was the "sole and absolute" owner of all right title and interest to Work Product, as defined in paragraph 4 of the consulting agreement, related to Mediware's Software created during TJC's tenure under the consulting agreement. (Ex. 7, ¶4)

47.     Without even feigning the intention to comply with the restrictive covenants of the employment agreement or the consulting agreement, prohibiting Collins from participating in a venture competing with Mediware for a year, Defendant Collins filed the formation documents for HemaTerra in November 2011.  A true and correct copy of the formation papers are attached hereto as **Exhibit 8.**

48.     In the HemaTerra articles of incorporation, Defendant Collins named himself the sole Managing Member, conspicuously and publicly breaching the covenant not "to own, manage, operate, control or participate in the ownership, management or control of, or be connected as an officer, employee, partner, director, or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any entity or business which competes with any business conducted by" Mediware within one year of the expiration of the employment agreement. (Ex. 2, ¶ 6.)

49.     The newly formed HemaTerra did not intend to create anything *new* in the blood management market, but instead touts itself as providing another "choice" for customers in the market. A true and correct copy of a HemaTerra press release is attached hereto as **Exhibit 9**.

50.     The "choice" HemaTerra intends to provide is a derivative software product utilizing the Mediware Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information that HemaTerra's managing member sold to Mediware and contracted to never disclose to a competitor.

51.     Confirming HemaTerra's intent, the newly formed company hired Defendants Revay, Dawson, and Ceccorulli, the senior blood management team that Mediware had hired to develop, market and sell the intellectual property purchased from IMS under the APA.

52.     When HemaTerra hired Revay, Dawson, and Ceccorulli, HemaTerra was aware of the former Mediware employees' covenants forbidding them to disclose and/or utilize Mediware Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

53.     Despite the agreements, HemaTerra and the four former Mediware employees collectively and improperly used Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information to create HemaControl, a directly competitive blood management program that encompasses enhancements and features contemplated while Defendants worked for Mediware.

54.     In conjunction with the development of the HemaControl product, HemaTerra targeted Mediware's customers to purchase and launch the pilot program of HemaControl.

55.     In October of 2012, HemaTerra publicly announced the fruits of its forbidden labor with the launch of the pilot program for HemaControl with CarterBlood Care, the largest blood center in Texas and a customer of Mediware. (Ex. 9).

56.     In addition to CarterBlood Care, HemaTerra is rapidly targeting, interfering with and converting other Mediware customers.

57.    Because HemaTerra and its employees are statutorily and contractually prohibited to engage in such conduct, Mediware seeks to enjoin HemaTerra from further improper utilization Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

58.    Mediware has retained the law firms of Smith, Gambrell & Russell, LLP and Barack Ferrazzano Kirschbaum & Nagalberg LLP to represent it in this action and is obligated to pay the firms a reasonable sum for legal services rendered in connection herewith.  Pursuant to Florida Statute § 688.005, the common law of Florida, and the various written agreements sued on in this matter, Defendants are obligated to pay to Plaintiff its reasonable attorneys' fees and costs incurred in this matter.

59.    All conditions precedent to the maintenance of the claims set forth herein have occurred in fact or by operation of law or have otherwise been waived by Defendants.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS
### (against all Defendants)

60.    Mediware realleges and incorporates in Count I by reference paragraphs 1 through 59 of the Complaint.

61.    This is an action for injunctive relief, damages, exemplary damages, and attorneys' fees as a result of all Defendants' violation of Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq.* and the common law of Florida.

62.    Mediware's trade secrets include but are not limited to the Software, its Confidential Information, as defined by Collins' and Ceccorulli's Employment Agreements, and its Proprietary Information, as defined by Dawson's and Revay's Employment Agreements.

63.    Mediware's trade secrets were communicated to and shared with Defendants while they were employed at Mediware.

14

64.    Mediware took reasonable steps to protect the secrecy of its trade secrets, including requiring Defendants to sign employment agreements mandating that they safeguard Mediware's trade secrets.

65.    Defendants knowingly misappropriated Mediware's trade secrets for their own and HemaTerra's benefit.

66.    The individual Defendants' conduct was for their benefit and the benefit of HemaTerra, the company they started to compete with Mediware.

67.    After HemaTerra's formation, HemaTerra was aware of and complicit with the individual Defendants' continued improper conduct. HemaTerra possesses Mediware's trade secrets, which it is aware were improperly and illegally taken from Mediware. Plaintiff is entitled to injunctive relief pursuant to § 688.003, Florida Statutes, prohibiting Defendants from using and profiting from Plaintiff's trade secrets.

68.    Moreover, Plaintiff has suffered damages as a direct and proximate result of Defendants' misappropriation of Plaintiff's trade secrets, for which all Defendants are liable to Plaintiff, pursuant to § 688.004, Florida Statutes.

## COUNT II – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ECONOMIC ADVANTAGE
### (against all Defendants)

69.    Mediware realleges and incorporates in Count II by reference paragraphs 1 through 59 of the Complaint.

70.    This is an action against all Defendants for injunctive relief and damages in connection with Defendants' tortious interference with Plaintiffs' business relationships and prospective economic advantage under the common law of Florida.

71.    While Defendants were employed at Mediware, the company had a network of customers with whom it had longstanding business relationships, including Carter BloodCare, the largest blood center in Texas.

72.    During their employment at Mediware, Defendants knew of Mediware's business relationships with these customers, including Carter BloodCare.

73.    After leaving Mediware to form HemaTerra, Defendants intentionally and unjustifiably interfered with Mediware's business relationship with its customers, including Carter BloodCare.

74.    Specifically, Defendants approached and pitched Carter BloodCare to purchase and engage in the pilot trial of HemaControl.

75.    Defendants' inaugural attempt to impermissibly interfere with Mediware's business relationships and prospective economic advantage succeeded and Carter BloodCare publicly announced its intention to purchase and pilot the first implementation of HemaControl.

76.    The individual Defendants' conduct was for their benefit and the benefit of HemaTerra, the company they started to compete with Mediware.

77.    In addition to CarterBlood Care, HemaTerra is rapidly targeting, interfering with and converting other Mediware customers.

78.    After HemaTerra's formation, HemaTerra was aware of and complicit with the individual Defendants' continued improper conduct.  HemaTerra benefits from business relationships with former customers of Mediware; and HemaTerra is aware that those relationships are improperly and illegally taken from Mediware.

79.    Mediware has suffered and will continue to suffer harm and damages as a result of Defendants' tortious interference with its business relationships and will inevitably suffer

further harm as the Defendants continue their efforts to improperly cannibalize Mediware's business relationships.

80.    Mediware has no adequate legal remedy for the harm Defendants have caused and continue to cause Mediware, and is therefore entitled to immediate injunction relief and attorneys' fees.

## COUNT III – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ECONOMIC ADVANTAGE
### (against HemaTerra)

81.    Mediware realleges and incorporates in Count III by reference paragraphs 1 through 59 of the Complaint.

82.    This is an action against HemaTerra for injunctive relief and damages in connection with Defendants' tortious interference with Plaintiffs' business relationships and prospective economic advantage under the common law of Florida.

83.    The individual defendants are contractually prohibited under the APA, their respective employment agreements and/or statute from utilizing and/or disclosing Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

84.    HemaTerra was aware of the existence of and the obligations contained within the APA and the individual defendants' employment agreements before HemaTerra hired the individual defendants.

85.    Specifically, HemaTerra was aware that the individual defendants were contractually prohibited from utilizing and or disclosing Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information at the time HemaTerra hired the individual defendants.

86.     HemaTerra intentionally and unjustifiably interfered with the obligations the individual defendants owe to Mediware through the creation, marketing and selling of HemaControl, software created through the use of Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information in contravention to the defendants' contractual obligations to Mediware.

87.     HemaTerra is liable to Mediware pursuant to Florida common law for tortious interference with Mediware's business relationships.

Mediware has no adequate legal remedy for the harm HemaTerra has caused and continue to cause Mediware, and is therefore entitled to immediate injunction relief and attorneys' fees.

## COUNT IV – CONVERSION
### (against all Defendants)

88.     Mediware realleges and incorporates in Count IV by reference paragraphs 1 through 59 of the Complaint.

89.     This is an action for conversion under the common law of Florida against all Defendants

90.     Defendants wrongfully and without authorization assumed control over Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information for use in developing and running an illicitly competitive business.

91.     Mediware has an absolute and unconditional right to the immediate possession of its Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

92.    Mediware has made verbal and written demands that Defendants return and cease using its Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

93.    Defendants have refused to return and cease using Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

94.    Defendants are liable to Mediware under Florida's common law for conversion of Mediware's trade secrets.

95.    Mediware is entitled to immediate injunctive relief, damages, exemplary damages, and attorneys' fees.

<u>COUNT V – BREACH OF CONTRACT</u>
**(against Defendants Collins and Ceccorulli arising from APA)**

96.    Mediware re-alleges and incorporates in Count V by reference paragraphs 1 through 59 of the Complaint.

97.    The APA is a valid and binding contract.

98.    Mediware has either performed all of its obligations under the APA or stands ready, willing, and able to perform them.

99.    Defendants Collins and Ceccorulli breached their obligations under the APA by:

A.    Making use of Mediware's trade secrets, confidential information, and Software to develop, promote, and advance HemaTerra's competing business in violation of Section 5 of the APA;

B.    Divulging Mediware's Confidential Information and Trade Secrets in violation of Section 9 of the APA; and

C.    Misusing Mediware's intellectual property to develop, promote, and advance HemaTerra's competing business in violation of the Assignment of Intellectual Property contained in the APA.

100.    Defendants' breach of the APA directly and proximately caused damage to Mediware in an amount to be proven at trial.  Pursuant to the terms of the APA, Mediware is therefore entitled to damages, exemplary damages, and attorneys' fees pursuant to Illinois common law.

**COUNT VI – BREACH OF CONTRACT**
**(against Defendants Collins and Ceccorulli arising from Employment Agreement)**

101.    Mediware re-alleges and incorporates in Count VI by reference paragraphs 1 through 59 of the Complaint.

102.    The employment agreements between Collins and Mediware and Ceccorulli and Mediware are valid and binding contracts.

103.    Mediware has either performed all of its obligations under the employment agreements or stands ready, willing, and able to perform them.

104.    Defendants Collins and Ceccorulli breached their obligations under their respective employment agreements by:

A.    Failing to use their best efforts to promote the interests of Mediware and failing to devote their full business time and energies to the business and affairs of Mediware, in violation of Section 1 of the employment agreement;

B.    Disclosing Mediware's Confidential Information to third parties and making use of the such Confidential Information for the benefit of HemaTerra in violation of Section 6 of the employment agreement;

C.    Competing with the Mediware's business within one year following the termination of their employment at Mediware in violation of Section 6 of the employment agreement;

D.    Persuading and/or attempting to persuade Mediware customers to cease doing business with Mediware in violation of Section 6 of the employment agreement;

E.    Soliciting for their benefit and the benefit of HemaTerra customers of Mediware within six months prior to the termination of Defendants' employment in violation of Section 6 of the employment agreement;

F. Persuading or attempting to persuade Mediware employees to leave Mediware within six months prior to the termination of Defendants' employment in violation of Section 6 of the employment agreement; and

G. Failing to disclose developments to the Software while they were employed at Mediware in violation of Section 7 of the employment agreement.

105. Defendants' breach of their employment agreements directly and proximately caused damage to Mediware in an amount to be proven at trial. Pursuant to the terms of the employment agreements, Mediware is therefore entitled to damages, exemplary damages, and attorneys' fees pursuant to Kansas common law.

<u>**COUNT VII – BREACH OF CONTRACT**</u>
**(against Defendants Revay and Dawson arising from Employment Agreement)**

106. Mediware re-alleges and incorporates in Count VII by reference paragraphs 1 through 59 of the Complaint.

107. The employment agreements between Dawson and Mediware and Revay and Mediware are valid and binding contracts.

108. Mediware has either performed all of its obligations under the employment agreements or stands ready, willing, and able to perform them.

109. Defendants Dawson and Revay breached their obligations under their respective employment agreements by:

A. Failing to keep confidential Mediware's Proprietary Information in violation of Section 1 of the employment agreement;

B. Disclosing Mediware's Proprietary Information and making use of such information for the benefit of a competing business in violation of Section 1 of the employment agreement;

C. Allowing Mediware's Proprietary Information to be used by a third party competitor in violation of Section 1 of the employment agreement;

    D. Soliciting or taking away Mediware customers on whom Defendants called or with whom they became acquainted during their employment with Mediware in violation of Section 2 of the employment agreement;

    E. Usurping for their own benefit and HemaTerra's benefit Inventions they assigned to Mediware in violation of Section 5 of the employment agreement; and

    F. Failing to disclose Inventions to Mediware in violation of Section 6 of the employment agreement.

110.    Defendants' breach of their employment agreements directly and proximately caused damage to Mediware in an amount to be proven at trial. Mediware is therefore entitled to damages, exemplary damages, and attorneys' fees.

## COUNT VIII – BREACH OF CONTRACT
### (against Defendant TJC arising from Consulting Agreement)

111.    Mediware re-alleges and incorporates in Count VIII by reference paragraphs 1 through 59 of the Complaint.

112.    The consulting agreement is a valid and binding contract.

113.    Mediware has either performed all of its obligations under the consulting agreement or stands ready, willing, and able to perform them.

114.    Defendant TJC breached its obligations under the consulting agreement by:

    A. Failing to keep confidential Mediware's Confidential Information in violation of Section 5 of the consulting agreement;

    B. Disclosing Mediware's Confidential Information and making use of such information for the benefit of a competing business in violation of Section 5 of the consulting agreement;

    C. Allowing Mediware's Proprietary Information to be used by a third party competitor in violation of Section 5 of the consulting agreement;

    D. Usurping for its own benefit and HemaTerra's benefit Work Product he assigned to Mediware in violation of Section 4 of the consulting agreement; and

E.  Failing to disclose Work Product to Mediware in violation of Section 4 of the consulting agreement.

115.    Defendant's breach of his consulting agreement directly and proximately caused damage to Mediware in an amount to be proven at trial.  Mediware is therefore entitled to injunctive relief, damages, exemplary damages, and attorneys' fees against TJC and its officers, directors, employees and agents, including Defendant Collins.

## COUNT IX – CIVIL CONSPIRACY
### (against all Defendants)

116.    Mediware re-alleges and incorporates in Count IX by reference paragraphs 1 through 59 of the Complaint.

117.    The four individual defendants entered into an agreement to form a company to directly compete with Mediware through the misappropriation of Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

118.    The individual defendants committed overt acts of the conspiracy, certain of which acts transpired in Florida, by creating, marketing and selling HemaControl, software derived from the misuse of Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

119.    After HemaTerra's formation, HemaTerra was aware of and complicit with the individual Defendants' continued improper conduct.

120.    Defendants' conspiracy caused damage to Mediware in an amount to be proven at trial.  Mediware is therefore entitled to damages, exemplary damages, and attorneys' fees.

## COUNT X– COMPUTER FRAUD AND ABUSE ACT
### (against Defendants Collins, Ceccorulli, Revay and Dawson)

121.    Mediware re-alleges and incorporates in Count X by reference paragraphs 1 through 59 of the Complaint.

122.    The individual defendants had access to Mediware's protected computers that contained Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

123.    The individual defendants knowingly and with the intent to defraud Mediware, exceeded their authorization to access the protected computers and misappropriated Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information for personal benefit and the benefit of HemaTerra to create HemaControl.

124.    The individuals' conduct violated The Computer Fraud and Abuse Act because the offense caused loss to Mediware aggregating at least $5,000 in damages as a result of, *inter alia,* the investigation into the misappropriation, lost income from enhancements to the Software and interference with existing and prospective business relationships. *18 U.S.C. §1030(a)(4)(A)(i)(I).*

125.    As a result of the individual defendants' violation of The Computer Fraud and Abuse Act, Mediware is entitled to compensatory damages.

## COUNT XI INJUNCTIVE RELIEF
### (Against all Defendants)

126.    Mediware re-alleges and incorporates in Count XI by reference paragraphs 1 through 59 of the Complaint.

127.    Pursuant to the terms of APA and employment agreements executed by the Defendants, Mediware has a clear legal right to exclusive possession and control of Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information.

128.    Further, Mediware has a clear right to conduct business without the tortious interference by Defendants.

129.    The Defendants' misuse of Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information is causing Mediware irreparable harm for which any remedy at law would be inadequate.

130.    In fact, Collins and Ceccorulli explicitly covenanted that breaching the terms of their employment agreements related to Mediware's Confidential Information, Trade Secrets and/or Intellectual Property, Collins and Ceccorulli entitles Mediware to injunctive relief with respect to that breach because such breach would result in irreparable harm for which any remedy at law would be inadequate.  (Ex. 2 ¶ 9; Ex. 3 ¶ 9.)

131.    Like Collins and Ceccorulli, Revay and Dawson agreed that if they breached their employment agreements, Mediware would be entitled to an injunction or other appropriate order to restrain such breach. (Ex. 4 ¶ 9; Ex. 5 ¶ 9.)

WHEREFORE, Mediware respectfully requests this Court enter an order awarding:

A.    A permanent injunction against Defendants prohibiting them from making use of Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information;

B.    A permanent injunction against Defendants prohibiting them from continuing their tortious interference with Mediware's business relationships and prospective economic advantages;

C.    A permanent injunction against Defendants ordering them to immediately return all information constituting Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information;

D.    A permanent injunction against Defendants prohibiting the use or disclosure of all information constituting Mediware's Trade Secrets, Confidential Information, Intellectual Property and Proprietary Information;

E.    A permanent injunction against Defendants prohibiting them from soliciting Mediware's customers, prospective customers, and/or employees;

F.    Compensatory and punitive damages in an amount to be determined at trial;

G.    Attorneys' fees, costs, prejudgment interest; and

H.    Such other and further relief this Court deems just, equitable, and proper

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues so triable as a matter of right.

Dated:  January 28, 2013

Respectfully Submitted,

SMITH, GAMBRELL & RUSSELL, LLP

FL Bar No. 84579

_Steve E. Brust_

Steve E. Brust
Trial Counsel
Florida Bar No. 0832091
sebrust@sgrlaw.com
50 N. Laura Street, Ste. 2600
Jacksonville, FL  32202
(p) 904-598-6100
(f)  904-598-6300

Attorneys for Plaintiff

-and-

Roger H. Stetson
Roger.Stetson@bfkn.com
Illinois Bar No. 6279862
Barack Ferrazzano Kirschbaum
  & Nagalberg LLP
200 West Madison Street, Suite 3900
Chicago, IL 60606
(p) 312-629-7339
(Pro Hac Vice Motion to be Filed)